Okay, may it please the court. I'm Karen Landau and I represent Timothy Peoples, and I am appearing remotely as you can see. I will watch my time. Before I start, I would like to withdraw the claim of ineffective assistance of counsel and the plain error argument. So arguments C and D of the brief. Thank you. Um, so that leaves us with two arguments. And the principal argument here, of course, is that the court was the court abused its discretion in weighing the credibility of the defense witnesses and ruling that no reasonable juror could find that a I don't know if I can call him Korea, a corrupt police officer participated in the search of the Mr. Peoples residence. Um, well, and just to be clear, I mean, you were, you know, hedging on your use of corrupt. It really doesn't matter. Your argument doesn't hinge on whether he was, as you say, corrupt or not corrupt. The question is, we have a factual dispute here about whether Amari was present. And your position is the district court is prohibited under the rules from weighing in on the credibility and whether your witness, whether defense witness was believable or not, that had to go to a jury. Is that your position? Well, it is your honor. I mean, he was corrupt, but you're right. It doesn't don't force us to buy into more than we need to prison now. So there we go. Um, but that's either here or there. No, but you're right, your honor. The point is that that the court really, and the court even said so in its order, he said, you know, she's just not believable. She's strongly motivated in favor of her partner, which that's a given. That's pretty much the case with most most most witnesses are motivated in favor of one party or the other. But, you know, she was impeached. And I'm not I'm not saying she wasn't. And there was evidence that he wasn't there. But there was her evidence that he he was. And, you know, so you see, so I guess I'm trying to give you the credibility that you have it. You have a reasonable argument that the district court overstepped on excluding this. You still have to overcome. And you heard a little bit about this in our prior case. You know, you still have to show that it would have changed the outcome. And and I guess that's where I'm struggling is a little bit of a evidence that was brought in upon which the conviction happened was obtained well before Amari got involved at all. Well, let's let's talk about that, because so here's the thing. Mr. Peoples wasn't charged with conspiracy. And that, you know, I think, honestly, I don't know why the government didn't charge him with conspiracy, but they didn't charge him with conspiracy. So he was only charged with possession with intent to distribute based on the cocaine that was found in his house. And the evidence that and the government, yes, had considerable evidence that he had been distributing cocaine. But there was evidence that it had stopped before the search. So what what evidence that he'd stopped before? Well, he did. As I recall, there was a break because Lorenzo Lee, who was the source of supply, had stopped selling. And so and I may be misremembering this, but that was my there was a lapse. So wasn't there 52 recorded phone calls where he ordered where he ordered cocaine? Again, yes, I am not I'm not disputing that he and again, the point is, but he was reformed. That's your position. I don't know if he was reformed or not. But I think there's a real question whether this whether he was doing it at the time is when was exactly in the last defense. That was the only defense. You know, there was no. I mean, you're right. They had the phone calls and there was that was his defense. So, hey, you know, it really comes down. It really comes down to you think that if this had all gone to a jury and they had submitted the question and there'd been the and his his romantic partner had had testified to what she said, which I mean, the reason I think the district court maybe the district court judge erred by by effectively doing a credibility determination. But the reason he did that is because, frankly, it's it's it's it's hard to believe that anybody would have found that to be credible. So that brings us to the I understand that's your argument that, you know, he was dealing drugs before. I think she even said that he was dealing drugs, just not in the house, keeping it out of the house, I guess. Actually, your honor, she she said he didn't deal drugs. She was quite sure he didn't do drugs, but she said he used and he had a habit. And that was in a sense. And if you recall, there was that almost makes her a worse witness, though, right? Because we know that he was dealing drugs. I mean, well, yeah, no, I'm not saying she may not have been the greatest witness, but she was a witness. And actually, one thing I would point out is, you know, one of the things the district judge said is, well, she waffled on her identification. But what she didn't waffle on was the identification of the dogs. And I thought that was quite interesting because they're quite differently appearing. And she was she was very clear that the large German shepherd, which was you're laughing, but that's fine. No, it's I love how these cases was the one that came in the house. If you look at the pictures of the dogs, they are. I mean, there is a big difference as a as a dog person myself. There's a lot a big difference between a German shepherd and a Belgian Malinois. But be that as it may look, if she had testified, you know, look, of course, can I say he would have been acquitted? But there's a reason. Certainly there's a reasonable chance. And again, it's a reasonable probability that the the jury would have found he was guilty of possession or they might have believed, you know, they might have believed that the evidence has been planted. I don't know that that you are that if you are quite aware of the impact of the Antioch police scandal and how how you know, I mean, you know, that if this is not an insignificant, this is a in California, Northern California in particular, the news of this event was it's fair to call it cataclysmic. It has it has caused many jurors to, you know, to to not credit police testimony in the same way. So so the information that this would have that this officer was not only a member of the Antioch police department, but also was under indictment at the time for not only not only abusing his dog to bite people, which was quite clear, but also fraud, all of these charges, which he's was convicted of, that would have had a big impact. And that was excluded. Now, you know, it could have gone the other way. But when things could have gone either way, then I mean, that's, you know, I don't have to prove beyond a reasonable doubt that the jury would have acquitted my client. No, you don't. But I mean, I think you acknowledge, I guess really what this turns on is, are we able to say that the that the recordings and all of the prior surveillance would not have been enough? And that that's, I think that's where I open up my questioning. And that's what Judge Van Dyke's questioning is geared at is, it seems like it was pretty overwhelming that any mistake here effectively was harmless in the conviction, except that, as I said, there was a lapse between the end of the recordings and the execution of the search. And certainly you're correct. The jury could have said, well, how much a lapse was that? You know, Your Honor, I can't. That was the one thing I did not check. Your argument of your argument is that there was a 24 hour break. It's not that compelling. And try to find that for you in rebuttal. But unless the government, maybe the government will be able to tell us. Or provide that to you in a 28-J letter. I apologize. That is something I should have known. I would like to address briefly the issue of the jury instruction. I recognize the case in Hamilton. Obviously, Hamilton approved a similar instruction. But I do think this case is- That decision was issued after you appealed, right? Yes. Yes. After I wrote the opening brief. Yeah. Yeah. Of course. Yes. But yes. But nonetheless, I do think this case is distinguishable. I distinguished it in the reply. But you know, this case was, you know, the defense did not argue. The defense conceded that the evidence was was legally obtained. The question was, you know, was it trustworthy? And that was the entire defense. And the court's instruction took the scales in favor of the prosecution. And in fact, the prosecution in closing rebuttal, which is the last thing the jury hears, said, you know, look, they're saying the evidence was planted. And the court just told you everything was legally obtained. So that, you know, that distinguishes this case from Hamilton. If there's no further questions, I would say- I just want to be clear. You are withdrawing the career offender in the IAC claims? Yeah. The plain error. Yes, Your Honor. Got it. My apologies. My apologies. That's what I thought. Yes. I'll reserve. We'll hear from the government. Good morning. May it please the court, Elizabeth Berenger for the United States. The district court did not abuse its discretion either in finding certain evidence was irrelevant or by instructing the jury about its proper role. But rule 104 says specifically with respect to relevance, when the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist. So it creates a carve out from the rule that the judge decides other predicate questions like Daubert qualifications, et cetera, by a preponderance. When it comes to relevance, which was the issue here and a predicate fact, was he present? The standard is whether sufficient evidence was produced to establish the fact. And her testimony does do that, even though it was heavily impeached. He made a credibility term. He seems to have done exactly what 104B says he can't do. Am I right? I don't agree with that, Your Honor. First of all, when we combine 104A and 104B, reading it with Huddleston, the court has to find whether a reasonable jury could find the conditional fact by a preponderance of the evidence. So necessarily in that rule, the district court must act as a gatekeeper and determine the reliability of evidence under 104A. And make credibility determinations? I don't think that's what happened, Your Honor. That's what he said. If he did make a credibility determination, you would agree that's improper? In the sense that the court was acting as a gatekeeper, but let me just explain. It is inherently, when you look at what a reasonable jury could find by preponderance of evidence, the court must assess the reliability of the evidence. And in this case... But what he said was, you know, Alan demonstrated strong bias in favor of peoples and against the government. Her identification of Amiri as having been at the scene of the search was shaky at best and subject to impeachment. This is fact-finding. He's weighing the evidence and credibility. I don't agree with that, Your Honor. And the reason is, yes, in a vacuum. If we had this evidence in a vacuum, I would 100% agree with you, but it's not in a vacuum. Amiri could not be in two places at one time. He, according to the dispatch records, according to his own text messages from the time, he was at Lee's house. And he cannot be at Lee's house and at people's house. Hold on. I mean, there's two pieces of evidence here. One is the record that he was at this house, and then there were the text messages that came in later that said he was at another house. One of those has to be true. I agree. Well, the dispatch records and the text from Amiri's own phone, which the government had in his possession, where he's arranging rides to the scene and being told to show up are pretty strong evidence that he's at the Amiri's house. Let me give you a little counterfactual. Instead of his romantic partner, let's say it was his boss. So you had all the same evidence in the case, but you just replace her with this Amiri, whatever his name is, his boss. And he says, yeah, he was there. Your Honor, you still have the problem of Amiri can't be in two places at one time. Right. But the question is, which place was he in? 90% chance you're right. And the district court seemed to say 90% is good enough. It's not just, I mean, the 104A must have some meaningful role. It does. On issues like Daubert, whether or not you're qualified and expert, the judge makes the decision. But when it comes to questions of relevance, it's just, could it be found? Because otherwise, the judge is going to take over the whole trial and decide the issues. But this is not relevance. This is conditional relevance. And 104B has to be read in conjunction with 104A, where the court performs the same gatekeeper role when analyzing this job. That's Huddleston. Huddleston says the judge is the gatekeeper and has to decide what a reasonable jury could find by preponderance of the evidence. But even if, even if, I mean, I agree that the court held a suppression here and was willing to- Is this where you're going? Harmlessness? Well, not only based on the strength of the evidence, which the court has targeted, and it's my friend on the other side- And by the way, just to put a pin in, at some point, can you please address the time? Sure. Yes. And that was on- Because apparently he was reformed and he wasn't doing the same thing. This is from 1SER6. It lays out the days. There's three 30-day periods where the wiretap happened. All three 30-day periods, which were, the last one ended on February 17th. The search was on April 30th. But all three of those, he ordered kilos of cocaine every one to two days. So you a snapshot of three 30-day periods within the year, all of them were consistent. So, and I don't remember- Is that two week? Is that what I'm hearing? Was there a two week period after the end of the last wiretap? It was about 10 weeks, 10 weeks from the last wiretap. But importantly, I just want to- So there was 10 weeks in which he might not have been possessing. So he admitted to the officers when he arrested that he bought and sold cocaine and never claimed that the drugs in his house weren't his. There was also an encrusted, a cocaine encrusted grinder found in the house, which Alan put in the house before the police ever entered. So I mean, in addition to the wealth of evidence, the 50 calls and the three 30-day periods, the surveillance showing the delivery to his house, the drugs in the kitchen, cocaine residue, he still had $15,000 of cash in his house, which certainly shows he was still in the active process of drug dealing. Two officers testified that he ran towards the kitchen when they breached the entry. So he was running to where the drugs were, the encrusted grinder, of course, that Miss Allen put in the house. He made post-trial statements, never claimed that those weren't my drugs, which would seem natural for him to say if they weren't. And then he admitted at trial that he bought and sold drugs. But in addition to that harmlessness ground, the overwhelming evidence, there's this other harmlessness ground, and that is that there was this independent legal infirmity under 403, is that not only did we have, even if that evidence had come in, Miss Allen says he was at this house, they would have had to play the entire suppression hearing, whatever happened at the evidentiary hearing at the trial. So we have a whole day of just establishing he was at the house. But we also have to establish that he planted the drugs, which no one, I mean, that would just be conjecture. Nothing in his past showed that he planted drugs. So I just want to tell you that he was convicted, Amiri, after a 10-day trial. And this particular defendant was convicted after an eight-day trial. So we're going to be basically grafting on that 10-day police corruption trial onto this eight-day trial in order to establish that Amiri, in addition to being present at the scene, also planted the drugs. So as the government argued below, this was a classic waste of time in confusing the issues in this particular case. So if there are no further questions about that, I'm going to move on to the jury instruction issue. And of course, as my friend... Does Hamilton, I mean, doesn't Hamilton just control this? I believe it does, Your Honor, and it does. And I also want to just give the, I filed a 28-J last night. I'm sorry for the untimely. I know the court probably hasn't had a time to review it. It just came out on Friday over the holiday weekend. But I also feel like Hamilton, in conjunction with that new case, Denklau, it's pretty, this is a foreclosed issue. And in addition to Hamilton, this instruction was necessary. I just want to give the court a little bit of context about this case, that the jury had to be told that it was not their job to decide whether the evidence was illegally obtained based on the defendant's defense in this case, which suggested that the execution of the search and the recording of the confession was offensive or illegal. The defense had sought to suppress this evidence under the Fourth Amendment, claiming it was unreasonable. And then in the opening statement, raised this again, of course, the government objects and said, this was already dealt with. This has been dealt with in the suppression hearing. And the court says, well, I'm going to let it in, but am I going to let it in for bias only? But it was very overlapping and it was confusing. Even though it was framed as bias at trial, it overlapped with the suppression issue and could be interpreted as inviting the jury to speculate about the legality of the evidence. So much like this court's decision in DenClau, the court had these competing goals that it had to navigate in order to tell the jury its appropriate lane and what it should be deciding, what it shouldn't be deciding. And the defendant agreed. I know that there's been a lot of talk in the briefs about evidence planting being the defense, but that was sort of been a mutation of what the defense was at trial. It really was about an attack on the reliability of the evidence and the defendant agreed at the charging conference. I want to point out at 6 ER 1399 to 1401 that there was a difference between obtaining the evidence illegally or improperly. The court attempted to make sure the defendant could argue that improper tainting by taking out the government's proposed improperness and just focusing on the illegality and also added an additional instruction there that could focus on the weight of the evidence at the defendant's request. So the court was really trying to make sure both that the jury would not improperly use the evidence as well as that the defendant could continue to argue his theory of the defense. The evidence planting was mentioned for the first time in the government's rebuttal argument where it's castigated the defense argument as one of evidence planting, but that was never raised by the defense at trial. I just want to clarify a couple other things from the reply brief is that it was argued that the government used the instruction improperly to discuss the evidence planting, but I did want to point the court to the part of the record. It's on 6 ER 1534 where it discusses when the prosecutor reads the instruction with regard to people and my reading of it is the instructions relating to that first paragraph on 1534 where the prosecutor says ignore all the distractions. He wants to talk about a lot of things other than the fact that it was cocaine on the kitchen counter and what are those other things what are those distractions that is the execution of the search. So I believe that the prosecutor's comments when read in context were talking about the execution of the search, but even if the court were to find contrary to case law in Hamilton that the instruction was improper, any error would be harmless as in Hamilton because the jury was also instructed that misdrear peoples had to know and have awareness knowingly possess the drugs. So even if there was some confusion about the instruction touching upon his defense of evidence planting, it still had to find he knew and if the evidence had been planted or any juror believed that the evidence had been planted, they couldn't find that he knew and possessed drugs that were planted in his home. So if the court doesn't have any further questions, I would ask you to affirm the conviction and sentence in this case. Thank you. We're here rebuttal now. Sorry, I had to find the mouse button. Your honor. Well, I do have a couple of points. So as you heard from the prosecutor, and thank you, there was 10 weeks between the phone call and the search. And I would just like to correct one thing that my opponent said he was not receiving kilograms, he was getting ounces. And so there were no kilograms as to my client. And he didn't admit anything at trial. That was another thing that the assistant U.S. attorney said. He didn't testify at trial. But I think we go back to- I thought though that he... I didn't think that she said he testified at trial, but that he agreed to it in interviews with the police officer. There was. You're right. There was a post arrest interview. And yes, he did make admissions in that. And the defense did try to exclude that, and that was denied. And that was the subject of litigation. That's correct. Yes, he made admissions. He did. But I do not believe he admitted that that particular cocaine was for distribution. And again, we have to be focused on the particular cocaine in this case, because he was not charged with conspiracy and he was not convicted of conspiracy. The other thing I think is I think counsel has overstated the type of 403 problem that you would have had had the court admitted, had the court allowed Allen to testify, had the court allowed the defense to present the possibility that Amiri was present. I don't think we would have had a second corruption trial, but I do think there would have been evidence I recall the defense asked to introduce the indictment, the two indictments that he was facing. He hadn't been convicted yet. And one of those indictments was fraud charges. So, again, I do think that is overstated. If there's no further questions, I would submit. OK, thank you. Thank you to both counsel for your arguments in the case. The case is now submitted.
judges: NELSON, COLLINS, VANDYKE